RECEIVED & FILED
CLERK'S OFFICE

AUG 07 2020

US DISTRICT COURT
SAN JUAN, PR

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Criminal No. _20-248 (PG)_ |
| Plaintiff, | Count One: 18 U.S.C. § 371 (Conspiracy) |
| v. | Counts Two—Four: 18 U.S.C. §§ 666 and 2 (Federal Funds Theft, Bribery, and Kickbacks) |
| **[1] MARIA MILAGROS CHARBONIER-LAUREANO,** a/k/a "Tata," a/k/a "Charbo," | Counts Five—Ten: 18 U.S.C. §§ 1343 and 1346 (Honest Services Wire Fraud) |
| **[2] FRANCES ACEVEDO-CEBALLOS,** | Counts Eleven—Twelve: 18 U.S.C. §§ 1956 and 2 (Money Laundering) |
| **[3] ORLANDO MONTES-RIVERA,** | Count Thirteen: 18 U.S.C. § 1519 (Obstruction of Justice) |
| and | |
| **[4] ORLANDO GABRIEL MONTES-CHARBONIER,** a/k/a "Gabby," a/k/a "Gaby," | |
| Defendants. | |

## INDICTMENT

The Grand Jury charges:

## BACKGROUND ALLEGATIONS

1.      At all times material to this Indictment, unless otherwise set forth, with all dates and times alleged to be "on or about" or "in or about," and all amounts alleged to be "approximately":

2.      The Commonwealth of Puerto Rico was a self-governing Commonwealth in association with the United States of America.  The Commonwealth of Puerto Rico was governed by executive, legislative, and judicial branches.  The legislative power resided in the Puerto Rico Senate and the Puerto Rico House of Representatives.

3.     In each of the calendar years 2017, 2018, 2019, and 2020, the Commonwealth of Puerto Rico received more than $10,000 in federal benefits.

4.     The Puerto Rico House of Representatives consisted of approximately fifty-one members, forty from electoral districts, and eleven at large members.  Representatives served four-year terms.

5.     A Representative's duties included, but were not limited to: (a) investigating, studying, assessing, reporting, making recommendations, and amending or substituting measures or matters related to the jurisdiction of the House or the Representative's committee; (b) scheduling and holding public hearings and executive meetings, summoning witnesses, and hearing testimony related to matters within the jurisdiction of the House or the Representative's committee; (c) drafting, filing, and voting on bills of law, resolutions, and substitute measures; and (d) appraising, approving, and overseeing certain budgets and expenditures of the Commonwealth.

6.     Defendant **MARIA MILAGROS CHARBONIER-LAUREANO** a/k/a "**TATA**" a/k/a "**CHARBO**" ("**CHARBONIER**") was elected to an at large seat in the House of Representatives in 2012.  She was re-elected in 2016.  **CHARBONIER** regularly uses the nickname "**TATA**," including on her official Twitter account: "@TataCharbonier."

7.     In or about April 2017, **CHARBONIER** and others introduced and voted for a resolution to establish a Code of Ethics for members of the House of Representatives.  The proposed Code of Ethics, which was ultimately adopted by the House, provided as follows:

| Spanish Original | English Translation |
|---|---|
| **Artículo 4(e):** <br><br> Los Representantes atenderán diligentemente las necesidades colectivas e individuales de sus representados, realizando, para tal fin, las gestiones correspondientes con miras a responder a las necesidades de sus representados, gratuitamente, sin perjuicio y sin interés alguno distinto al inspirado en el bien común y en el fiel cumplimiento de sus prerrogativas legislativas. | **Article 4(e):** <br><br> The Representatives shall diligently tend to the collective and individual needs of their constituents, carrying out, for this purpose, the corresponding steps with the aim to respond to the needs of their constituents, free of charge, without prejudice and without any interest other than that inspired by the common good and in faithful compliance with their legislative prerogatives. |
| **Artículo 4(j):** <br><br> Ningún Representante aceptará o solicitará de persona o entidad pública o privada, jefes de agencias o empleados públicos, directa o indirectamente, para él o ella, algún miembro de su unidad familiar o cualquier otra persona, negocio o entidad, bien alguno, incluyendo regalos, promesas, favores o servicios, a cambio de que la actuación de dicho Representante esté influenciada a favor de esa persona o a favor o en contra de cualquier otra persona. | **Article 4(j):** <br><br> No Representative shall accept or request from a public or private person or entity, heads of agencies or public employees, directly or indirectly, for him or her, any member of their family unit or any other person, business or entity, or any other including gifts, promises, favors or services, in exchange for the fact that the performance of said Representative is influenced in favor of that person or against any other person. |

8.    As a Representative, consistent with the House Code of Ethics, **CHARBONIER** owed a fiduciary duty to provide honest services to the Commonwealth of Puerto Rico and its citizens.

9.    In her capacity as a Representative, **CHARBONIER** presided over the Ethics Committee.  She was also a member of committees charged with reforming both the Puerto Rico civil laws and the Puerto Rico criminal laws.

10.    Defendant **ORLANDO MONTES-RIVERA ("MONTES")** is **CHARBONIER's** husband.

11.    Defendant **ORLANDO GABRIEL MONTES-CHARBONIER** a/k/a "**GABBY**" a/k/a "**GABY**" ("**MONTES-CHARBONIER**") is **CHARBONIER's** son.    **MONTES-CHARBONIER** is known by the nickname "**GABBY**" or "**GABY**" in reference to his middle name.

12.    Defendant **FRANCES ACEVEDO-CEBALLOS ("ACEVEDO")** is an assistant to **CHARBONIER**, who has worked in **CHARBONIER's** office in the House of Representatives or on behalf of a House committee chaired by **CHARBONIER** since 2013.

13.    Person A began working for **CHARBONIER** in or about 2013, eventually serving as the director of her legislative office.  In or about mid-2019, Person A ceased working for **CHARBONIER**.

14.    Person B began working for **CHARBONIER** in or about 2019, eventually serving as the director of her legislative office after Person A ceased working for **CHARBONIER**.

15.    At all times during the conspiracy, the Puerto Rico House of Representatives would pay legislators and employees approximately every two weeks, through either a physical check or through a direct deposit into a bank account selected by the legislator or employee.

16.    At all relevant times during the conspiracy, **CHARBONIER's** bi-weekly, net government salary was approximately $2,500.

17.    From 2014 until early 2017, **ACEVEDO's** bi-weekly, net government salary as an assistant to **CHARBONIER** was approximately $800.   In or about early 2017, however, **ACEVEDO's** bi-weekly, net government salary more than doubled to over $2,100.

18.    From mid-2017 until in or about July 2020, **ACEVEDO's** bi-weekly, net government salary was between $2,700 and $2,900.

**COUNT ONE**
**18 U.S.C. § 371**
**(Conspiracy – All Defendants)**

19.    Paragraphs one through eighteen are incorporated and realleged as if fully set forth herein.

**Objects of the Conspiracy**

20.    Beginning in or about early 2017 and until in or about July 2020, in the District of Puerto Rico and elsewhere, defendants **CHARBONIER, MONTES, MONTES-CHARBONIER,** and **ACEVEDO** did knowingly and willfully conspire and agree together and with each other, and with other persons both known and unknown to the Grand Jury, to commit the following offenses against the United States:

a.    **Theft Concerning Programs Receiving Federal Funds**: that is, for defendant **CHARBONIER**, an agent of the Commonwealth of Puerto Rico, a territory which during each relevant one-year period received federal benefits in excess of $10,000, by a variety of means, and together with and aided and abetted by **MONTES, MONTES-CHARBONIER, ACEVEDO**, and others known and unknown to the Grand Jury, to

5

embezzle, steal, obtain by fraud, and otherwise without authority knowingly convert to the use of any person other than the rightful owner, and intentionally misapply, property worth $5,000 or more, and that was owned by, or was under the care, custody, and control of the Commonwealth of Puerto Rico, in violation of Title 18, <u>United States Code</u>, Sections 666(a)(1)(A) and 2;

b.    **Bribery and Kickbacks Concerning Programs Receiving Federal Funds**: that is, for defendant **CHARBONIER**, an agent of the Commonwealth of Puerto Rico, a territory which during each relevant one-year period received federal benefits in excess of $10,000, together with and aided and abetted by **MONTES, MONTES-CHARBONIER**, and others known and unknown to the Grand Jury, to corruptly solicit, demand, accept, and agree to accept for their own benefit, things of value from defendant **ACEVEDO**, intending to be influenced and rewarded in connection with a transaction and series of transactions valued at $5,000 or more, that is inflating **ACEVEDO's** government salary, in violation of Title 18, <u>United States Code</u>, Sections 666(a)(1)(B) and 2;

c.    **Bribery and Kickbacks Concerning Programs Receiving Federal Funds**: that is, for defendant **ACEVEDO**, aided and abetted by others known and unknown to the Grand Jury, to corruptly give, offer, and agree to give things of value to defendant **CHARBONIER**, an agent of the Commonwealth of Puerto Rico, a territory that received federal benefits in excess of $10,000 during all relevant one-year periods, intending to

6

influence and reward defendant **CHARBONIER** in connection with a transaction and series of transactions valued at $5,000 or more, that is inflating **ACEVEDO's** government salary, in violation of Title 18, United States Code, Sections 666(a)(2) and 2; and

d.    **Honest Services Wire Fraud**: that is, for **CHARBONIER, MONTES, MONTES-CHARBONIER, ACEVEDO**, and others known and unknown to the Grand Jury, to devise and intend to devise a scheme and artifice to defraud and deprive the citizens of the Commonwealth of Puerto Rico and the government of the Commonwealth of Puerto Rico of their right to the honest and faithful services of **CHARBONIER**, a member of the Puerto Rico House of Representatives, through bribery and kickbacks, in violation of Title 18, United States Code, Sections 1343 and 1346.

### Purposes of the Conspiracy

21.    It was a purpose of the conspiracy for **CHARBONIER, MONTES, MONTES-CHARBONIER**, and **ACEVEDO** to enrich themselves by embezzling, stealing, obtaining by fraud, and without authority knowingly converting to their use, and intentionally misapplying, property and money that was owned by, or was under the care, custody, and control of the Commonwealth of Puerto Rico, that is, the fraudulently inflated portion of **ACEVEDO's** government salary.

22.    It was a further purpose of the conspiracy for **CHARBONIER, MONTES**, and **MONTES-CHARBONIER** to enrich themselves by exploiting **CHARBONIER's** official position as a legislator to obtain bribes and kickbacks from **ACEVEDO** in exchange for inflating **ACEVEDO's** government salary and to share in the proceeds of that inflated salary.

23.    It was a further purpose of the conspiracy for **ACEVEDO** to enrich herself by corruptly securing an inflated government salary from defendant **CHARBONIER**, a portion of which **ACEVEDO** kept for herself, by paying **CHARBONIER** bribes and kickbacks.

24.    It was a further purpose of the conspiracy for **CHARBONIER, MONTES, MONTES-CHARBONIER**, and **ACEVEDO** to conceal from the Commonwealth of Puerto Rico and its citizens, and from the federal government, their corrupt scheme.

### Manner and Means of the Conspiracy

25.    The manner and means of the conspiracy included, but were not limited to, the following:

26.    Beginning in or about early 2017, in exchange for **ACEVEDO's** agreement to kick back a portion of **ACEVEDO's** salary to **CHARBONIER, CHARBONIER** caused **ACEVEDO's** bi-weekly, net government salary to be fraudulently increased from approximately $800 to approximately $2,100 and, later, by approximately September 2019, to as much as approximately $2,900. **CHARBONIER** specifically agreed to raise **ACEVEDO's** salary, and at all times retained ultimate decision-making authority for all employee salaries in her office.

27.    Beginning in early 2017 and continuing until in or about July 2020, **ACEVEDO** would receive her bi-weekly paycheck and keep a portion of the inflated salary for herself (initially depositing her portion it in an account she had at Financial Institution 1 and later in an account she opened at Financial Institution 2). **ACEVEDO** would then kick back between approximately $1,000 and $1,500 out of each inflated salary payment to **CHARBONIER, MONTES**, and **MONTES-CHARBONIER**.

28.    The defendants used a variety of means to transfer the kickback from **ACEVEDO** to **CHARBONIER, MONTES**, and **MONTES-CHARBONIER**, including but not limited to the

following methods:

      a.      **ACEVEDO** sometimes transferred cash by hand to **MONTES, MONTES-CHARBONIER**, and other individuals connected to **CHARBONIER**.

      b.      **ACEVEDO** sometimes transferred kickbacks to Person A, Person B, or another individual, who would in turn provide the funds to **CHARBONIER**.

      c.      **ACEVEDO** sometimes transferred kickbacks in approximately $500 increments to **MONTES** or to **MONTES-CHARBONIER** using ATH Móvil, a mobile phone application that allows individuals who bank at certain financial institutions to send money to each other through an interface on their cell phones.  ATH Móvil has a $500 daily transfer limit.

      d.      **ACEVEDO** sometimes left cash kickbacks in a pre-determined location, such as **CHARBONIER's** purse, for **CHARBONIER** to collect.

### Acts in Furtherance of the Conspiracy

29.     In furtherance of the conspiracy and to achieve its purposes, defendants **CHARBONIER, MONTES, MONTES-CHARBONIER,** and **ACEVEDO,** and other individuals known and unknown to the Grand Jury, committed the following overt acts, among others, in the District of Puerto Rico and elsewhere:

30.     In or about early 2017, although her bi-weekly, net government salary had been approximately $800 for the past three years, in exchange for **ACEVEDO's** agreement to kick back a portion of **ACEVEDO's** salary to **CHARBONIER, CHARBONIER** fraudulently increased **ACEVEDO's** bi-weekly, net government salary to approximately $2,100 and later to as much as approximately $2,900.

31.    On or about July 10, 2017, **ACEVEDO** received a paycheck for $2,712.47.  On or about that same day, **ACEVEDO** cashed the entire $2,712.47 check at Financial Institution 2, which held a bank account controlled by the Puerto Rico House of Representatives, **ACEVEDO's** employer.  **ACEVEDO** then deposited $720 into her Financial Institution 1 account, retaining approximately $1,992.47 in cash.  On or about July 10, 2017, a $1,500 deposit was posted to an account at Financial Institution 3 controlled by **CHARBONIER**.

32.    On or about November 10, 2017, **ACEVEDO** received a paycheck for $2,712.47. On or about that same day, **ACEVEDO** cashed the entire $2,712.47 check at a Financial Institution 2 branch.  On or about November 14, 2017, **ACEVEDO** deposited approximately $922 in cash into her Financial Institution 1 account, retaining approximately $1,790 of her paycheck in cash.

33.    On or about November 27, 2017, **ACEVEDO** received a paycheck for $2,712.47. On or about November 28, 2017, **ACEVEDO** cashed the entire $2,712.47 check at a Financial Institution 2 branch.  On or about that same day, **ACEVEDO** deposited $1,200 into her Financial Institution 1 account, retaining approximately $1,512.47 in cash.  Also on or about that same day, a $1,500 deposit was posted to an account at Financial Institution 3 controlled by **CHARBONIER**.

34.    On or about March 15, 2018, **ACEVEDO** opened an account with Financial Institution 2.  **ACEVEDO** then began to cash her bi-weekly paychecks at Financial Institution 2. On almost every occasion that she brought her bi-weekly paycheck to a Financial Institution 2 branch, she deposited a portion of the check and withheld or withdrew approximately $1,500 in cash, which she then paid in the form of a kickback to **CHARBONIER**, **MONTES**, and **MONTES-CHARBONIER**.  For example, this pattern is shown below for the period between March 26, 2018 and June 13, 2018:

| Date of ACEVEDO's Paycheck | ACEVEDO's Paycheck Amount | Amount Deposited to ACEVEDO's Account | Amount Withheld or Withdrawn |
|---|---|---|---|
| 03/26/2018 | $2,712 | $1,212 | $1,500 |
| 04/10/2018 | $2,669 | $1,169 | $1,500 |
| 04/25/2018 | $2,669 | $1,169 | $1,500 |
| 05/11/2018 | $2,669 | $1,169 | $1,500 |
| 05/25/2018 | $2,669 | $1,069 | $1,600 |
| 06/13/2018 | $2,669 | $1,169 | $1,500 |

35.     This general pattern of **ACEVEDO** receiving a government paycheck, retaining a portion of the paycheck herself, and then withholding or withdrawing approximately $1,500 in cash to be used as a kickback payment, continued for years.  For example:

36.     On or about June 28, 2018, **ACEVEDO** received a paycheck for $2,999.88. On or about June 28, 2018, **ACEVEDO** deposited $1,499.88 from that paycheck into her account at Financial Institution 2.  The remaining $1,500 was not deposited.  On or about June 29, 2018, a $1,000 deposit was posted to an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3.

37.     On or about November 28, 2018, **ACEVEDO** brought her paycheck for $2,817.60 to a Financial Institution 2 branch.  She deposited $1,317.60, but retained $1,500 from that paycheck in cash.  Approximately two days later, on or about November 30, 2018, $1,500 was deposited in an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3.

38.     On or about December 18, 2018, **ACEVEDO** brought her paycheck for $2,817.60 to a Financial Institution 2 branch.  She deposited $100, but retained $2,717.60 in cash.  The next day, on or about December 19, 2018, $1,500 was deposited in an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3.  On or about December 20, 2018, $1,500 was transferred from the account controlled by **CHARBONIER** and **MONTES** at

Financial Institution 3 to an account controlled only by **CHARBONIER** at Financial Institution 3.

39.     On or about July 25, 2019, **ACEVEDO** received her $2,817.60 bi-weekly paycheck via direct deposit into her Financial Institution 2 account.  She transferred $1,300 over the next week to **MONTES** in the following transactions:

a.     On or about July 29, 2019, **ACEVEDO** transferred $500 from her Financial Institution 2 account via an ATH Móvil wire transfer to a phone belonging to **MONTES**.  That money was deposited into an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3.  On or about that same day, $500 was transferred from the account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3 to an account controlled by **CHARBONIER** at Financial Institution 3.

b.     On or about July 31, 2019, **ACEVEDO** transferred $500 from her Financial Institution 2 account via an ATH Móvil wire transfer to a phone belonging to **MONTES**.  That money was deposited into an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3.

c.     On or about August 1, 2019, **ACEVEDO** transferred $300 from her Financial Institution 2 account via an ATH Móvil wire transfer to a phone belonging to **MONTES**.  That money was deposited into an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3.  On or about August 5, 2019, $300 was transferred from an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3 to an account controlled by **CHARBONIER** at Financial Institution 3.

40.    On or about August 9, 2019, **ACEVEDO** received her $2,817.60 bi-weekly paycheck via direct deposit into her Financial Institution 2 account. She transferred approximately $1,500 over the next week to **CHARBONIER** and **MONTES** in the following transactions:

      a.    On or about August 12, 2019, **ACEVEDO** transferred $500 from her Financial Institution 2 account via an ATH Móvil wire transfer to a phone belonging to **MONTES**. That money was deposited into an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3. On or about that same day, August 12, 2019, $500 was transferred from an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3 into an account controlled by **CHARBONIER** at Financial Institution 3.

      b.    On or about August 13, 2019, **ACEVEDO** withdrew $1,000 from her Financial Institution 2 account. **CHARBONIER** and **ACEVEDO** then had the following text message exchange over the Apple iMessage messaging service:

| Sender | Spanish Original | English Translation |
|---|---|---|
| **CHARBONIER** | Fran | Fran |
| **CHARBONIER** | Cambiaste? | You cashed it? |
| **ACEVEDO** | Ayy si | Ohh yes |

41.    On or about October 24, 2019, **ACEVEDO** received her $2,873.33 bi-weekly paycheck via direct deposit into her Financial Institution 2 account. On or about October 27, 2019, **ACEVEDO** attempted to make approximately eleven $500 ATH Móvil transfers to a phone used

13

by **MONTES**, which was linked to an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3. The message associated with each of the various payments read: "De Tata" ("For Tata"). But each of the attempted transfers over the ATH Móvil system failed. On or about that same day, October 27, 2019, **CHARBONIER** and **ACEVEDO** had the following text message exchange over the Apple iMessage messaging service:

| Sender | Spanish Original | English Translation |
|--------|------------------|---------------------|
| **CHARBONIER** | Fran, le Pasaste eso a Orlando? | Fran, you passed that to Orlando? |
| **ACEVEDO** | No, porque me dice error | No, because it tells me error |
| **ACEVEDO** | Habrá que sacarlos | It will have to be withdrawn |

42.    On or about November 8, 2019, **ACEVEDO** received her $2,873.33 bi-weekly paycheck via direct deposit into her Financial Institution 2 account. On or about November 10, 2019, **ACEVEDO** transferred $500 via ATH Móvil to a phone used by **MONTES-CHARBONIER**, which funds were deposited into an account controlled by **MONTES-CHARBONIER** at Financial Institution 3. On or about November 14, 2019, **MONTES-CHARBONIER** transferred $500 via ATH Móvil to a phone used by **MONTES**; that same $500 was thereby deposited into an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3. On or about November 15, 2019, $500 was transferred from the account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3 to an account controlled by **CHARBONIER** at Financial Institution 3.

43.    On or about December 19, 2019, **ACEVEDO** received her $2,873.33 bi-weekly paycheck via direct deposit into her Financial Institution 2 account. Over the next week, she transferred $1,500 via ATH Móvil to a phone used by **MONTES** (and thereby into an account

controlled by **CHARBONIER** and **MONTES** at Financial Institution 3) in the following transactions:

    a.    On or about December 23, 2019, **ACEVEDO** transferred $500 from her Financial Institution 2 account via an ATH Móvil wire transfer to a phone belonging to **MONTES**. The message associated with the payment read: "Para Tata" ("For Tata"). That $500 was deposited into an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3.

    b.    On or about December 24, 2019, **ACEVEDO** transferred $500 from her Financial Institution 2 account via an ATH Móvil wire transfer to a phone belonging to **MONTES**. The message associated with the payment read: "De Tata" ("For Tata"). That $500 was deposited into an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3. On or about that same day, December 24, 2019, a $500 transfer was made from the account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3 to an account controlled by **CHARBONIER** at Financial Institution 3.

    c.    On or about December 25, 2019, **ACEVEDO** transferred $500 from her Financial Institution 2 account via an ATH Móvil wire transfer to a phone belonging to **MONTES**. The message associated with the payment read: "De Tata" ("For Tata"). That $500 was deposited into an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3.

44.    On or about January 9, 2020, **ACEVEDO** received her $2,873.33 bi-weekly paycheck via direct deposit into her Financial Institution 2 account. Approximately $1,500 of that

paycheck was used to pay a kickback to **CHARBONIER**, **MONTES**, and **MONTES-CHARBONIER**:

    a.    On or about January 11, 2020, **ACEVEDO** transferred $500 via ATH Móvil to a phone used by **MONTES-CHARBONIER**, which funds were deposited into an account controlled by **MONTES-CHARBONIER** at Financial Institution 3.  On or about January 11, 2020, **MONTES-CHARBONIER** withdrew approximately $500 from that same account. On or about January 16, 2020, **MONTES** deposited approximately $500 into an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3.

    b.    On or about January 11, 2020, **ACEVEDO** withdrew $500 from her Financial Institution 2 account at an ATM.  On or about January 13, 2020, **ACEVEDO** withdrew another $500 from her Financial Institution 2 account at an ATM.   On or about that same day, January 13, 2020, **CHARBONIER** sent the following messages to **ACEVEDO** over the WhatsApp messaging service:

| Sender | Spanish Original | English Translation |
|---|---|---|
| **CHARBONIER** | Y ponme en la gaveta de la guagua el sobre. | And put the envelope in the SUV's drawer. |
| **CHARBONIER** | Si cambiaste. | If you cashed it. |

    45.    On or about February 10, 2020, **ACEVEDO** received her $2,873.33 bi-weekly paycheck via direct deposit into her Financial Institution 2 account.  On or about February 12, 2020, **ACEVEDO** withdrew $1,500 from her Financial Institution 2 account.  On or about

February 13, 2020, $1,000 was deposited into an account controlled by **CHARBONIER** and **MONTES**.

46.    On or about March 11, 2020, **ACEVEDO** received her $2,873.33 bi-weekly paycheck via direct deposit into her Financial Institution 2 account.  On or about March 12, 2020, **ACEVEDO** withdrew $1,500 from her Financial Institution 2 account.  On or about the evening of March 12, 2020, **ACEVEDO** sent a text message to **CHARBONIER** over the Apple iMessage messaging service: "donde dejo eso? O a quien?" ("where do I leave that? or with whom?").

47.    On or about March 26, 2020, **ACEVEDO** received her $2,873.33 bi-weekly paycheck via direct deposit into her Financial Institution 2 account.  On or about April 1, 2020, **CHARBONIER** and **ACEVEDO** had the following text message exchange over the WhatsApp messaging service:

| Sender | Spanish Original | English Translation |
|---|---|---|
| **CHARBONIER** | Fran llama a Gaby para que pase por tu casa y me traiga eso. El viene más tarde para acá. | Fran call Gaby so he can go by your house and bring me that.  He is coming here later. |
| **CHARBONIER** | Viene a traerme Algo que me Llego por correo.  Mándale eso en un sobre. | He is coming to bring me Something that came for me in the mail.  Send him that in an envelope. |
| **ACEVEDO** | Eaahhh, pues al parecer el ya vino aquí y se fue | Ahhh, well looks like he already came and left |
| **ACEVEDO** | Déjame llamarlo | Let me call him |

48.    On or about April 27, 2020, **ACEVEDO** received her $2,873.33 bi-weekly paycheck via direct deposit into her Financial Institution 2 account.  Two days later, on or about April 29, 2020, **CHARBONIER** sent the following message to **ACEVEDO**: "Fran, llévaselo a Gaby." ("Fran, take it to Gaby").

All in violation of Title 18, <u>United States Code</u>, Sections 371.

## COUNT TWO
### 18 U.S.C. §§ 666(a)(1)(A) and 2
### (Federal Funds Theft – All Defendants)

49.     Paragraphs one through eighteen and twenty-nine through forty-eight are incorporated and realleged as if fully set forth herein.

50.     In each of the calendar years 2017, 2018, 2019, and 2020, the Commonwealth of Puerto Rico received in excess of $10,000 from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance.

51.     **CHARBONIER** was at all relevant times an agent of the Commonwealth of Puerto Rico whose duties included those of an elected Representative of the Commonwealth of Puerto Rico.

52.     Beginning in or about early 2017 and until in or about July 2020, in the District of Puerto Rico and elsewhere, defendant **CHARBONIER**, aided and abetted by **MONTES**, **MONTES-CHARBONIER**, **ACEVEDO**, and others known and unknown to the Grand Jury, embezzled, stole, obtained by fraud, without authority knowingly converted to the use of any person other than the rightful owner, and intentionally misapplied property worth $5,000 or more and owned by, under the care of, under the custody of, and under the control of the Commonwealth of Puerto Rico, in each one-year period, that is: **CHARBONIER**, being an agent of the Commonwealth of Puerto Rico, aided and abetted by **MONTES**, **MONTES-CHARBONIER**, **ACEVEDO**, and others known and unknown to the Grand Jury, fraudulently obtained money from the Commonwealth of Puerto Rico by unlawfully inflating **ACEVEDO's** government salary and retaining the inflated portion of that salary for the defendants' own use and benefit.

All in violation of Title 18, <u>United States Code</u>, Sections 666(a)(1)(A) and 2.

## COUNT THREE
### 18 U.S.C. §§ 666(a)(1)(B) and 2
**(Federal Funds Bribery and Kickbacks – Charbonier, Montes, Montes-Charbonier)**

53.     Paragraphs one through eighteen and twenty-nine through forty-eight are incorporated and realleged as if fully set forth herein.

54.     In each of the calendar years 2017, 2018, 2019, and 2020, the Commonwealth of Puerto Rico received in excess of $10,000 from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance.

55.     **CHARBONIER** was at all relevant times an agent of the Commonwealth of Puerto Rico whose duties included those of an elected Representative of the Commonwealth of Puerto Rico.

56.     Beginning in or about early 2017 and until in or about July 2020, in the District of Puerto Rico and elsewhere, defendant **CHARBONIER**, in each one-year period, within which the Commonwealth of Puerto Rico received in excess of $10,000 in federal program benefits, together with and aided and abetted by **MONTES, MONTES-CHARBONIER**, and others known and unknown to the Grand Jury, did corruptly solicit and demand for their own benefit, and accept and agree to accept, things of value from defendant **ACEVEDO**, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions involving $5,000 or more, that is, **ACEVEDO's** inflated government salary.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

## COUNT FOUR
### 18 U.S.C. §§ 666(a)(2) and 2
**(Federal Funds Bribery and Kickbacks – Acevedo)**

57.     Paragraphs one through eighteen and twenty-nine through forty-eight are incorporated and realleged as if fully set forth herein.

58.    In each of the calendar years 2017, 2018, 2019, and 2020, the Commonwealth of Puerto Rico received in excess of $10,000 from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance.

59.    **CHARBONIER** was at all relevant times an agent of the Commonwealth of Puerto Rico whose duties included those of an elected Representative of the Commonwealth of Puerto Rico.

60.    Beginning in or about early 2017 and until in or about July 2020, in the District of Puerto Rico and elsewhere, defendant **ACEVEDO**, aided and abetted by others known and unknown to the Grand Jury, in each one-year period, within which the Commonwealth of Puerto Rico received in excess of $10,000 in federal program benefits, aided and abetted by others known and unknown to the Grand Jury, did corruptly give, offer, and agree to give things of value to **CHARBONIER**, **MONTES**, and **MONTES-CHARBONIER**, intending to influence and reward **CHARBONIER** in connection with a business, transaction, and series of transactions involving $5,000 or more, that is, **ACEVEDO's** inflated government salary.

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

### COUNTS FIVE TO TEN
**18 U.S.C. §§ 1343, 1346**
**(Honest Services Wire Fraud – Various Defendants)**

61.    Paragraphs one through eighteen, twenty through twenty-four, and twenty-nine through forty-eight are incorporated and realleged as if fully set forth herein.

62.    Beginning in or about early 2017 and until in or about July 2020, in the District of Puerto Rico and elsewhere, the defendants **CHARBONIER**, **MONTES**, **MONTES-CHARBONIER**, **ACEVEDO**, and others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud and deprive the citizens of the Commonwealth

of Puerto Rico and the government of the Commonwealth of Puerto Rico of their right to the honest services of a public official, namely the honest services of **CHARBONIER**, a member of the Puerto Rico House of Representatives, through bribery and kickbacks.

63.     On or about the dates set forth below, in the District of Puerto Rico and elsewhere, the defendants **CHARBONIER**, **MONTES**, **MONTES-CHARBONIER**, and **ACEVEDO**, aided and abetted by each other and by others known and unknown to the Grand Jury, having devised and intending to devise the above-described scheme and artifice to defraud and deprive, by means of material false and fraudulent pretenses, representations, and promises, and for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures, and sounds, that is, the following:

| Count | Date | Description | Charged Defendant |
|-------|------|-------------|-------------------|
| **5** | 07/25/2019 | $2,817.60 ACH Direct Deposit into **ACEVEDO's** Financial Institution 2 account | **CHARBONIER MONTES ACEVEDO** |
| **6** | 08/09/2019 | $2,817.60 ACH Direct Deposit into **ACEVEDO's** Financial Institution 2 account | **CHARBONIER MONTES ACEVEDO** |
| **7** | 10/24/2019 | $2,873.33 ACH Direct Deposit into **ACEVEDO's** Financial Institution 2 account | **CHARBONIER MONTES ACEVEDO** |
| **8** | 11/08/2019 | $2,873.33 ACH Direct Deposit into **ACEVEDO's** Financial Institution 2 account | **CHARBONIER MONTES MONTES-CHARBONIER ACEVEDO** |
| **9** | 12/19/2019 | $2,873.33 ACH Direct Deposit into **ACEVEDO's** Financial Institution 2 account | **CHARBONIER MONTES ACEVEDO** |
| **10** | 01/09/2020 | $2,873.33 ACH Direct Deposit into **ACEVEDO's** Financial Institution 2 account | **CHARBONIER MONTES MONTES-CHARBONIER ACEVEDO** |

All in violation of 18, United States Code, Sections 1343 and 1346.

## COUNTS ELEVEN TO TWELVE
### 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2
### (Money Laundering – Charbonier, Montes, Montes-Charbonier)

64.     Paragraphs one through eighteen and twenty-nine through forty-eight are incorporated and realleged as if fully set forth herein.

65.     On or about the dates listed below, in the District of Puerto Rico and elsewhere, the defendants, **CHARBONIER**, **MONTES**, and **MONTES-CHARBONIER**, aiding and abetting each other and knowing that the property involved in the financial transactions listed below represented the proceeds of some form of unlawful activity, which property in fact involved the proceeds of specified unlawful activity, conducted and caused to be conducted the financial transactions set forth below knowing that such transactions were designed in whole or in part to

22

conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, which was federal program theft and bribery in violation of Title 18, United States Code, Section 666 and honest services wire fraud in violation of Title 18, United States Code, Sections 1343 and 1346, and each transaction affecting interstate commerce, in that the defendants caused funds derived from specified unlawful activity to be transferred from an account controlled by **MONTES-CHARBONIER** at Financial Institution 3 to an account controlled by **CHARBONIER** and **MONTES** at Financial Institution 3 and also caused **MONTES-CHARBONIER** to withdraw funds derived from specified unlawful activity from his account at Financial Institution 3 to provide to **CHARBONIER** and **MONTES**:

| Count | Date | Financial Transaction | Amount | Charged Defendant |
|---|---|---|---|---|
| 11 | 11/14/2019 | Transfer from Acct # XXX-XX7219 at Financial Institution 3 to Acct # XXX-XX8393 at Financial Institution 3. | $500 | **CHARBONIER** **MONTES** **MONTES-CHARBONIER** |
| 12 | 01/11/2020 | Withdrawal from Acct # XXX-XX7219 at Financial Institution 3 | $500 | **CHARBONIER** **MONTES** **MONTES-CHARBONIER** |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

### COUNT THIRTEEN
### 18 U.S.C. § 1519
### (Obstruction of Justice – Charbonier)

66.    Paragraphs one through eighteen and twenty-nine through forty-eight are incorporated and realleged as if fully set forth herein.

67.    **CHARBONIER** became aware of the existence of this investigation, which was conducted by the Federal Bureau of Investigation, no later than July 11, 2020. On or about the morning of July 15, 2020, **CHARBONIER** became aware that a warrant had been obtained for

23

the cellular phone associated with the phone number 1 (787) 690-9591.

68.     On or about July 15, 2020, however, **CHARBONIER** deleted data on the cell phone associated with the phone number 1 (787) 690-9591. Specifically, **CHARBONIER** deleted nearly the entire call log, nearly all WhatsApp messages, and nearly all iMessages associated with this phone.

69.     On or about July 15, 2020, in the District of Puerto Rico and elsewhere, the defendant, **CHARBONIER**, knowingly did alter, destroy, mutilate, and conceal a record, document, and tangible object, including, but not limited to, text messages, electronic communications, and other data on a cellular phone associated with the phone number 1 (787) 690-9591, with the intent to impede, obstruct, and influence a matter, namely an investigation into possible violations of Title 18, United States Code, Sections 371, 666, 1343, 1346, and 1956, within the jurisdiction of a department and agency of the United States, to wit: the Federal Bureau of Investigation, and in relation to and in contemplation of such matter.

All in violation of Title 18, United States Code, Section 1519.

### FRAUD FORFEITURE ALLEGATION
### (28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

70.     Paragraphs one through sixty-three are incorporated and realleged as if fully set forth herein.

71.     Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to the defendants **CHARBONIER, MONTES, MONTES-CHARBONIER**, and **ACEVEDO**, that in the event of their convictions for any of the offenses charged in Counts One to Ten of this Indictment, all property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from such offense, is subject to forfeiture.

24

## MONEY LAUNDERING FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(1))

72.    Paragraphs one through forty-eight and sixty-five are incorporated and realleged as if fully set forth herein.

73.    Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to the defendants **CHARBONIER, MONTES,** and **MONTES-CHARBONIER,** that upon conviction of any of the offenses charged in Counts Eleven to Twelve of this Indictment, all property, real or personal, involved in money laundering offenses or traceable to such property, is subject to forfeiture.

### Money Judgment

74.    Defendants are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture.

### Substitute Assets

75.    Defendants are notified that in the event that property subject to forfeiture, as a result of any act or omission of that defendant,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property that cannot be divided without difficulty,

the United States will seek to forfeit any other property of that defendant up to the total value of the property subject to forfeiture pursuant to Title 21, United States Code, Section 853(p), as

25

incorporated by reference in Title 28, <u>United States Code</u>, Section 2461(c) and Title 18, <u>United States Code</u>, Section 982(b)(1).

A TRUE BILL

August 7, 2020

~~August 5th, 2020~~

DATE

W. STEPHEN MULDROW
United States Attorney

SETH A. ERBE
Chief, Financial Fraud and Public Corruption
Section

By: _____

María L. Montañez-Concepción
Assistant United States Attorney
U.S.D.C. No. 228301
350 Chardon Avenue
Torre Chardon, Suite 1201
Hato Rey, Puerto Rico 00918
Tel: 787-766-5656
Email: Maria.L.Montanez@usdoj.gov

COREY AMUNDSON
Chief, Public Integrity Section

JOHN D. KELLER
Principal Deputy Chief, Public
Integrity Section

By: _____

Jonathan E. Jacobson
Trial Attorney, Public Integrity Section
U.S.D.C. No. G02706
1331 F. St. NW, 3rd Fl.
Washington, DC 20004
Tel: 202-934-0886
Email: Jonathan.Jacobson@usdoj.gov